### UNITED STATES of America

v.

### John J. TORNIERO.

**Crim. No. 82–1106.**

United States District Court,
D. Connecticut.

Sept. 22, 1983.

Michael Hartmere, Jeremiah F. Donovan, Asst. U.S. Attys., Alan H. Nevas, U.S. Atty., New Haven, Conn., for plaintiff.

Hugh F. Keefe, New Haven, Conn., for defendant.

## MEMORANDUM AND ORDER [*]

JOSÉ A. CABRANES, District Judge:

Presently pending before the court is the United States' Motion to Reconsider the Law of Insanity (filed May 16, 1983).[1] The issues raised by that motion have been fully briefed, and the court has heard both the arguments of counsel and extensive testimony from expert witnesses on those matters. In this memorandum the court sets forth its ruling on the pending motion.

In an initiative apparently without parallel in American law, the Government asks this court to "abolish" the insanity defense. In other words, the court is asked to rule that insanity may not be asserted as a defense to a criminal prosecution, that a defendant may not call expert witnesses to testify about his mental condition, and that a jury may not receive special instructions on the question of insanity. The relief sought by the Government is sweeping and unprecedented.

The bases for this extraordinary motion are manifold. In its extensive memorandum in support of its motion,[2] the Govern-

---

[*] This memorandum and order replaces for all purposes the substantially identical memorandum and order entered by the court on August 26, 1983, which is hereby modified in a number of non-essential stylistic respects.

[1] On May 16, 1983, the Government filed its Motion to Reconsider the Law of Insanity. That motion stated that, in support of the motion, the Government relied on its "Brandeis-Brief," which was filed the same day. The brief in question is in four parts, of which the last part is styled "Motion in Limine to Exclude Any Expert Testimony Regarding the Defendant's Alleged Mental Disorder 'Compulsive Gambling.'" It appears to be the Government's view, however, that there is only a single motion before the court. Whether the mo-

tion *in limine* is an alternative claim for relief under the motion to reconsider or is a separate motion is not, however, an important point; for the sake of convenience, the court treats the two items as different motions. Throughout the briefing and hearings on these motions, the parties have at no time raised any questions about the relation of one motion to the other, and it is inconceivable that any prejudicial confusion could have resulted from the Government's arguably imperfect organization of its moving papers.

[2] The Government's briefing consists of the following: Government's "Brandeis-Brief" in Support of Motion to Reconsider the Law of Insanity, Parts I–III; Government's "Brandeis-Brief in Support of Motion to Reconsider the Law of

ment argues bluntly and forcefully that no legitimate purpose of the criminal justice system is served by maintenance of the insanity defense and that the practical consequences of the defense include the unsupervised release of some dangerous individuals from any form of governmental control or restraint, the sapping of public confidence in the nation's courts, the presentation of expert testimony in a setting that robs psychiatrists and other specialists of their credibility and undermines the value of their professional judgments, and the proliferation of endless new varieties of mental illness, asserted as defenses in ever more unlikely cases.

After prolonged hearings and a lengthy review of the pertinent literature, legal and medical, provided by the parties, the court cannot avoid concluding that the Government's concerns are genuine ones, accurately reflecting crucial problems that bedevil the country's courts, lawyers, and mental health professionals. The potential for confusion inherent in the system is starkly illuminated in the very case now before this court. The defendant has been charged with a relatively uncomplicated property offense, the interstate transportation of stolen goods. He now seeks to rely upon an insanity defense based upon a claim that he suffers from "compulsive gambling disorder." It is questionable whether such a disorder, characterized more by repeated engagement in a particular activity than by any derangement of one's mental faculties, amounts to a mental disease as that concept has long been understood by the criminal law. But it is even more troubling that the defendant asserts this defense in a case in which his alleged gambling is only tangentially related to the offense with which he has been charged. Despite the tenuous connection between the claimed disorder and the charged offense, the defendant asks that this court allow him to present to the jury the testimony of expert witnesses. Were the defendant's request granted, the jury might find itself faced with a parade of psychiatrists, psychologists, social workers, and others, some testifying for the defendant, some for the Government. The jury would find itself working its way through voluminous, probably contradictory, testimony couched in the technical jargons of the various mental health professions. Finally, it is not inappropriate for this court to consider that if the defendant's request were granted the court might well be confronted, in some future case, with a defense based upon, say, drug addiction asserted by a defendant charged with, say, trafficking in firearms, and with this case accurately cited as precedent.

Accordingly, the court concludes that it is appropriate to exclude any expert evidence concerning the defendant's alleged "compulsive gambling disorder." The court nonetheless holds, for reasons spelled out below, that the full scope of the relief sought by the Government—abolition of the insanity defense—cannot be granted, in part because much of the relief sought can be afforded the Government on more narrow grounds. Thus, the court will grant the Government the limitation upon the defendant's evidence and instructions to the jury that it seeks in this case. While today's ruling pertains specifically to today's case, the court is not unaware of other cases and of the social and legal climate within which the instant case arises. It shares the widespread and growing public concern that new mental disorders appear to be fabricated in unending succession, that psychiatrists often are required to submit themselves to public grilling by skilled ad-

Insanity, Part IV (with Appendix IV)—Motion in Limine to Exclude Any Expert Testimony Regarding the Defendant's Alleged Mental Disorder "Compulsive Gambling"; Appendices to Government's "Brandeis-Brief" in Support of Motion to Reconsider the Law of Insanity; Second Appendices to Government's "Brandeis-Brief" in Support of Motion to Reconsider the Law of Insanity; Appendices to Part IV [of]

Government's "Brandies-Brief" [sic] in Support of Motion to Reconsider the Law of Insanity (all filed May 16, 1983); and Government's Supplemental Brief in Response to Court's Order Dated May 26, 1983 (filed June 1, 1983). The defendant has submitted his Brief in Response to Government's "Brandeis-Brief" in Support of Its Motion to Reconsider the Law of Insanity (filed June 13, 1983).

vocates, and that defendants increasingly seek to "explain" their alleged criminal acts as somehow compelled by pathologies of vague description and scant relevance. For more than a century, the insanity defense has expanded its role in our criminal justice processes. Today the court declines the Government's invitation to "abolish" that defense. The court does, however, hold that the defense can and should be limited to instances where a jury could find that the defendant's mind was truly alienated from ordinary human experience at the time of the commission of the acts with which he is charged and where that mental condition had a direct bearing on the commission of those acts.

## I.

By indictment filed September 23, 1982, the grand jury charged the defendant, John J. Torniero, with ten counts of transporting stolen goods in interstate commerce, in violation of 18 U.S.C. § 2314. On October 12, 1982, pursuant to Rule 12.2, Fed.R.Crim.P., the defendant filed a Notice to Rely upon the Defense of Insanity and a Notice of Intention to Introduce Expert Testimony Regarding Mental Disease or Defect Inconsistent with the Mental Element Required for the Offense Charged. While the Government did not respond to those notices immediately, it did make the defendant and the court aware that it might pursue some form of opposition. Accordingly, after progress of this case had been somewhat delayed by a hearing on the defendant's motion to suppress evidence,[3] the court set forth limitations for briefing of any issues the Government might raise in response to the defendant's notices.[4] *See* Certified Official Transcript of Excerpt from Jury Selection (filed May 19, 1983). Pursuant to those limitations, the Government filed on May 16, 1983 its Motion to Reconsider the Law of Insanity. The court thereafter extended the time for responsive briefing by the defendant and set a date for a hearing on the Government's motion.[5] That hearing, which included the testimony of numerous witnesses,[6] began on June 21, 1983 and ended on June 29, 1983.

**3.** The defendant's Motion to Suppress Statements, Admissions, and Confessions of the Defendant was filed October 15, 1982, and, after completion of hearings on all other discovery motions, a hearing on the suppression motion was held on December 29, 1982, four witnesses testifying. Thereafter, both parties submitted proposed findings of fact and conclusions of law and, on March 18, 1983, the court issued its decision, denying the defendant's motion to suppress. The court's March 18, 1983 memorandum of decision contains a more detailed narrative account of the facts at issue in this case than it has been possible to present in the current ruling.

**4.** Although the defendant evidently was unsure whether the Government would submit anything resembling its Motion to Reconsider the Law of Insanity, the defendant was not surprised by, and did not object to, the motion's submission. *See* Certified Official Transcript of Excerpt from Jury Selection (filed May 19, 1983).

**5.** The court had originally ordered the defendant to respond to the Government's motion by not later than May 25, 1983. By order dated May 26, 1983, the court extended the time for the defendant to respond to June 13, 1983; on May 26, 1983, the court also ordered supplemental briefing by the Government submitted by not later than June 1, 1983.

**6.** The court heard testimony from eleven witnesses: Abraham L. Halpern, M.D., Clinical Professor of Psychiatry at New York Medical College, and Chairman of the Department of Psychiatry at United Hospital, Port Chester, N.Y. (June 21, 1983); Stephen Rachlin, M.D., Chairman, Department of Psychiatry and Psychology, Nassau County Medical Center, East Meadow, N.Y. (June 22, 1983); Marc A. Rubenstein, M.D., a psychiatrist in private practice in New Haven, Conn., with wide experience in forensic psychiatry (June 22, 1983); Robert E. Matefy, Ph.D., Professor of Clinical Psychology, University of Bridgeport, Bridgeport, Conn. (June 22, 1983); Msgr. Joseph A. Dunne, President, National Council on Compulsive Gambling, New York, N.Y. (June 23, 1983); Patricia M. Nere, M.S.W., Director, Connecticut Statewide Treatment Program for Compulsive Gambling, Bridgeport Mental Health Center, Bridgeport, Conn. (June 23, 1983); Ernst Prelinger, Ph.D., Chief Clinical Psychologist, Division of Mental Hygiene, Department of University Health, Yale University, New Haven, Conn. (June 23, 1983); Robert L. Custer, M.D., Chief of Treatment Services, Veterans Administration-Central Office, Washington, D.C. (June 28, 1983); Julian Taber, Ph.D., Director, Gambling Treatment Program, Brecksville Veterans Administration Medical Center, Cleveland, Ohio (June 28, 1983); Jay Katz, M.D., Garver Professor of Law and Psychoanalysis, Yale Law

In seeking to rely on the insanity defense and to introduce expert testimony, the defendant argues that, at the time of the acts described in the indictment, he suffered from so-called "compulsive gambling disorder," as described in the Diagnostic and Statistical Manual of Mental Disorders (3d Ed., 1980) ("DSM III"), § 312.31 at 291–292, promulgated by the American Psychiatric Association ("APA"). An individual suffering from that disorder is characterized as one who is "chronically and progressively unable to resist impulses to gamble," *id.* at 292. The defendant contends that his compulsive gambling led to an accumulation of debts that, in turn, compelled his commission of the acts with which he is charged.[7]

The practical effect of the defendant's notice of the introduction of expert testimony is to permit testimony on the defendant's behalf by psychiatrists, psychologists, and other mental health specialists, who would, under Article VII of the Federal Rules of Evidence, be permitted to offer professional opinions on the existence and effect of the condition from which the defendant claims to have suffered and to testify in response to hypothetical questions. Furthermore, by raising the issue of insanity, the defendant seeks to impose upon the Government the burden of proving beyond a reasonable doubt that the defendant was in fact sane at the time of the offenses with which he has been charged.

In response to the defendant's notices and in support of its motion, the Government has submitted a "Brandeis-Brief" in Support of Motion to Reconsider the Law of Insanity (filed May 16, 1983). As a preface to its argument, the Government contends that reconsideration of the law of insanity, on the scale sought by the Government, is indeed within the authority of the court, because the insanity defense in federal criminal law was created by adjudication in the lower federal courts rather than by statute or definitive ruling by the Supreme Court.

The Government then advances two general lines of argument. First, the Government contends that none of the five generally-recognized objectives of the criminal justice system—isolation, general deterrence, specific deterrence, rehabilitation, and retribution—is furthered by maintenance of the insanity defense. Second, the Government claims that the introduction of psychiatric testimony at a criminal trial undermines the processes of justice by providing evidence that is unreliable and confusing.

To a considerable extent the Government's argument draws its intellectual inspiration from the work of Dr. Abraham L. Halpern, Clinical Professor of Psychiatry at New York Medical College, Chairman of the Department of Psychiatry at United Hospital in Port Chester, N.Y., and the author of several articles on the insanity defense. Dr. Halpern, who testified at length during the hearing on the Government's motion, has suggested that the insanity defense is a "legal fiction": not a real defense at all, because its successful assertion usually leads to incarceration rather than freedom, the insanity defense was, in Dr. Halpern's view, originally conceived to blunt the application of capital punishment. In today's criminal justice system, with capital punishment infrequently meted out, the defense is

School, New Haven, Conn. (June 29, 1983); Howard Zonana, M.D., Associate Professor of Psychiatry, Yale University School of Medicine and Co-Director, Law and Psychiatry Unit, Yale University School of Medicine and Connecticut Mental Health Center, New Haven, Conn. (June 29, 1983).

7. The defendant has also alluded to a set of examinations and findings made by Dr. John A. Cegalis. *See* Defendant's Offer of Proof Re: Defense of Insanity (filed July 5, 1983). Those examination reports are reproduced in the record as Parts 2 and 3 of Appendix IV of the

Government's "Brandeis-Brief," *see* Note 2, *supra*. The defendant relies on Dr. Cegalis to offer his opinion that the defendant suffers from a characterological disturbance apart from his compulsive gambling disorder. To the extent that Dr. Cegalis's proposed testimony pertains to the state of mind of the defendant at the time of the commission of the acts with which he has been charged, and to the extent consistent with the instant ruling on the nature of the insanity defense, that testimony will be admissible at trial.

an anachronism, Dr. Halpern argues, and its presence invites the misuse of psychiatry by defense attorneys and physicians, while the relatively rare instances in which acquittals by reason of insanity occur serve to disrupt public confidence in the working of the criminal justice system. *See, e.g.,* Halpern, "The Fiction of Legal Insanity and the Misuse of Psychiatry," 2 Journal of Legal Medicine 18 (1980).

## II.

Because of the dramatic nature of the Government's application—which seeks abolition of insanity as a defense to criminal prosecution—the court took the unusual step of conducting a lengthy hearing on the Government's motion and of exercising its authority to ensure that the defendant would be able to summon expert witnesses to testify on his behalf. Mindful of the remarkable sweep of the Government's motion, the court also deems it the first task at hand to consider whether this court has authority to grant the relief the Government seeks.

The common law has recognized some variety of the insanity defense for almost half a millenium.[8] While justifications for acceptance of the defense have changed, the defense itself has achieved a stable position in the criminal law of this country. Though it is true that the United States Supreme Court has never held that the

Constitution requires the availability of the defense, every federal trial court permits it, as do nearly all of the states.[9]

Against that background, the United States Congress adopted in 1974 Rule 12.2 of the Federal Rules of Criminal Procedure, which requires that, when the accused intends to rely upon the insanity defense, the Government must be notified of that intention before trial. In itself, Congress's action in adopting that rule suggests a belief that, at least under some circumstances, the insanity defense ought to be available. It is hardly likely that Congress would have adopted a rule requiring procedures for the assertion of a defense that the legislature thought subject to judicial abolition. Moreover, the Advisory Committee Note to Rule 12.2 contemplates the adoption of a federal criminal code providing that "[i]n any prosecution for an offense lack of criminal responsibility by reason of mental disease or defect is a defense." While it is true that such a federal code has not, as of now, been adopted, its mention in the Advisory Committee Note suggests one of the assumptions upon which adoption of Rule 12.2 was predicated. That suggestion is supported by a reference in the Note to *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), the case in which the Supreme Court established that, once a doubt concerning the defendant's sanity has been raised, the burden of proving sanity

---

**8.** On the historical antecedents to the insanity defense, *see United States v. Freeman,* 357 F.2d 606, 615–620 (2d Cir.1966). *See generally* A Goldstein, *The Insanity Defense* (1967).

**9.** As adopted by our Court of Appeals, the American Law Institute ("ALI") test for mental disease or defect excluding responsibility provides:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

*See United States v. Freeman, supra,* 357 F.2d at 622 & n. 52, 628. All but one of the other

Courts of Appeals have clearly adopted the ALI test, though in some cases they have done so after modifying the language of the test. *See McDonald v. United States,* 312 F.2d 847 (D.C. Cir.1962) (en banc); *United States v. Currens,* 290 F.2d 751 (3d Cir.1961); *United States v. Chandler,* 393 F.2d 920 (4th Cir.1968) (en banc); *Blake v. United States,* 407 F.2d 908 (5th Cir.1969) (en banc); *United States v. Smith,* 404 F.2d 720 (6th Cir.1968); *United States v. Shapiro,* 383 F.2d 680 (7th Cir.1967) (en banc); *United States v. Frazier,* 458 F.2d 911 (8th Cir.1972); *Wade v. United States,* 426 F.2d 64 (9th Cir.1970); *Wion v. United States,* 325 F.2d 420 (10th Cir.1963), *cert. denied,* 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964). The position of the First Circuit is not entirely clear, although that court appears to look upon the ALI test with favor; *see Beltran v. United States,* 302 F.2d 48 (1962).

rests on the Government. In that case, Justice Harlan the elder, writing for the Court, noted and endorsed the tradition in Western law making insanity a defense to, at least, capital crimes.

The Government argues that cases such as *Davis v. United States, supra,* and *United States v. Freeman,* 357 F.2d 606 (2d Cir.1966), in which the Court of Appeals for the Second Circuit set forth the test for criminal responsibility where insanity is raised as a defense, decided only subordinate questions—location of the burden of proof, definition of criminal responsibility—without confronting directly the major issue of whether insanity ought to be a defense at all. While that is an accurate reading of the raw language of those opinions, it cannot be gainsaid that those courts, like the many others that have ruled on similar questions, implicitly assumed the availability of the insanity defense, at least in some circumstances. This court may not, strictly speaking, be bound by such unspoken assumptions. Nonetheless, it is clear that the Government, in this case, seeks to overthrow legal principles long accepted by our superior federal courts. A district court should not, in such a setting, effect the sort of profound alteration of our legal tradition the Government proposes. (The fact that, in the wake of the verdict in the case of John W. Hinckley, Jr., the assailant of President Reagan, a number of bills were introduced in Congress to limit the insanity defense further suggests Congress's present view that the insanity defense is now required and that legislative action would be required to "abolish" it.)

Yet to say that is not to dispose of the Government's motion in its entirety. That the insanity defense must be available in some cases does not necessarily mean that it must be available in all; there remains the question of the circumstances under which its assertion is appropriate.

To frame and then to answer those questions, we must inquire more closely into the purpose and significance of the insanity defense. In doing so, two considerations should be borne in mind. First, despite its notoriety, the insanity defense is rarely asserted and even more rarely successful.[10] As a practical matter, the insanity defense, whether abolished, maintained, or expanded, can have little impact on the effectiveness over all of the criminal justice system. Second, however, the insanity defense does have great symbolic importance, both because of the critical questions it raises about our conceptions of guilt and adjudication and because of the public concern aroused by a few successful assertions of the defense.[11]

### III.

Legal and philosophical writers have generally agreed that the criminal justice system has five major objectives, already mentioned above. The first objective is that of *isolation,* the separation of the criminal from the rest of society as a physical check on the criminal's ability to do further injury. The second objective is that of *general deterrence,* the prevention of crimes by other individuals through the exemplary punishment of the convicted offender. The third objective, that of *specific deterrence,* looks to the prevention of future crimes by the offender himself, with the impact of his punishment continuing to impress him after his release. The fourth objective is that of *rehabilitation.* That objective proceeds from the assumption that only an affirmative alteration of the offender's way of life will allow him to re-enter society after incarceration as a fully law-abiding citizen; accordingly, rehabilitative policies are designed, for example, to provide education, psychological counselling, or the development of job skills. Finally, there is the objective of *retribution.* Though somewhat difficult to define, that objective refers to

---

10. *See* American Psychiatric Association Statement on the Insanity Defense (December 1982), 140 *Am.J. Psychiatry* 681, 682 (June 1983).

11. For a recent general discussion of the wide implications of the insanity defense and the public significance of contemporary cases, *see* Kaufman, "The Insanity Plea on Trial," *N.Y. Times,* § 6 (Magazine) at 1, August 8, 1982.

satisfaction of the social need for just action, fulfillment of the expectations of others in the community (especially the criminal's victims) that punishment will be inflicted upon the guilty.

The Government has argued that none of those objectives is served by the insanity defense.[12]

With respect to isolation, the Government points out that in state criminal justice systems, the consequence of a successful assertion of the insanity defense—i.e., an acquittal by reason of insanity—is, usually, the initiation of civil commitment proceedings. In a federal court,[13] such as the present one, however, acquittal by reason of insanity leads to freedom for the defendant, despite the unresolved possibility that the defendant might pose a significant danger to other members of society. Hence, in federal courts, the objective of isolation is not advanced at all by maintenance of the insanity defense. Even in state criminal justice systems, the Government argues, the objective of isolation is not well-served, for, as Dr. Halpern pointed out during his testimony, a civil commitment proceeding, if it leads to institutionalization, usually results in hospitalization; most hospitals, however, are not organized to isolate patients. In the end, civil commitment may do very little to promote isolation of those persons who have been adjudicated insane.

General deterrence is undermined, the Government argues, by the insanity defense, because successful assertion of the defense encourages other members of the public to believe that it is possible to commit a criminal act yet evade criminal responsibility.

The objective of specific deterrence, claims the Government, would be better served by abandonment of the insanity defense. The Government argues that the significance of the insanity defense lies in the fact that it may be asserted by defendants who understood the nature of their actions and, with respect to the particular acts with which they are charged, could have behaved otherwise. The individual who suffers from delusions or hallucinations and who, consequently, cannot apprehend the reality of his acts need not rely on the insanity defense; in his case, the Government will not be able to prove that he had the particularized intention to do something he knew to be wrong, the *mens rea*, necessary for a criminal conviction.[14] In this context, the Government argues that even individuals suffering from mental disease or defect are capable of understanding that certain specific acts are associated with unpleasant consequences and thus of learning not to engage in such acts. Thus, the Government claims, the objective of specific deterrence would be advanced by retention of the usual sanctions for criminal offenses, even when committed by persons who, though having the requisite *mens rea*, are mentally disordered.

Maintenance of the insanity defense, it can be argued, has little bearing on the question of rehabilitation, as a convicted defendant can always be sentenced under conditions providing for appropriate professional treatment. Abolition or restriction of the insanity defense would merely shift the place of psychiatric testimony from the trial itself to the post-trial sentencing proceedings.

Finally, the Government contends that the achievement of retribution, satisfaction of the community's sense of justice, is gravely undermined by the insanity defense. The Government points to the public reactions to such widely-publicized trials as those of John W. Hinckley, Jr. (1982), and Robert H. Torsney, a white New York City policeman who killed a black youth (1977) (both acquitted by reason of insani-

12. See generally Goldstein and Katz, Abolish the Insanity Defense—Why Not?, 72 Yale L.J. 853 (1963).

13. Except in the District of Columbia: see di-Genova and Toensing, Bringing Sanity to the Insanity Defense, 69 A.B.A.J. 466 (April 1983).

14. See Goldstein and Katz, supra note 12, at 864–870.

ty), and Richard Herrin, the killer of Bonnie Garland, his girlfriend and fellow Yale student (1978) (charged with murder and convicted on a lesser count in part because of psychiatric testimony on his behalf),[15] and argues that the criminal justice system risks loss of public confidence and a populist turn toward extreme responses.

Though the Government's argument in favor of outright "abolition" of the insanity defense is tightly-woven and backed with scholarly authorities and statistics, as well as anecdotal evidence, it is not ultimately persuasive. To see why that is so, it is necessary to understand the proper justification for the insanity defense.

## IV.

In distinguishing between the sane and the insane, we cannot, as has already been mentioned, rely on the notion that the insane person does not know what he is doing. For to the extent that the Government cannot prove that the defendant knew that much, it has failed to prove *mens rea,* and no conviction can be obtained.

We also cannot rely on the notion that the behavior of the insane person is caused by forces other than that person's will, while the behavior of the sane person is volitional. Although that notion is pervasive in the legal literature on the insanity defense, it is fraught with difficulties. For one thing, there are defendants who would be generally deemed insane, yet who act in ways which do not expose them to criminal liability: one may, after all, hear a divine voice, but one need not necessarily obey it. More important, any defendant, adopting what might be called the viewpoint of science (especially of social, psychological, and medical science), could argue that his acts were presumptively determined by forces beyond his control.

That is a point made by many of the authorities upon whom the Government relies—such as Dr. Willard Gaylin, Director of the Hastings Center Institute of Society, Ethics and the Life Sciences, and author of a study of the Richard Herrin trial, *The Killing of Bonnie Garland* (1982). Dr. Gaylin reminds us that the scientific view of events depends on the assumption that all events, including human behavior, are caused by prior events or circumstances.[16] A satisfactory scientific explanation is one that connects events in the present to events in the past. When that sort of explanatory scheme is applied to human behavior, argues Dr. Gaylin, it *always* leads to the conclusion that something outside the individual's control "caused" the individual's present behavior. One would not need to fit the conventional pattern of insanity to rely on such explanations. An accused drug trafficker, for example, might claim that when one considered the impoverished environment in which he grew up, the failure of the state to provide him with an enlightened moral education, and the frequency and social acceptance of drug use in his neighborhood, one could not say that he acted with complete volition. Yet, though many Americans would accept that defendant's description of his background as accurate, few if any would characterize him as insane. (That does not mean, of course, that the facts concerning his background would have no place in the criminal justice system: rather, it means that those facts would bear upon his sentence instead of upon his conviction).

That point, in turn, suggests an important limitation upon our acceptance of scientific—and particularly psychiatric—evidence in the context of criminal prosecutions. While science may be deterministic, the law cannot be. If the law were to come to define insanity—which is a legal, not a

---

**15.** On Hinckley, *see* Kaufman, *supra* note 11; on Torsney, *see* Halpern, The Fiction of Legal Insanity and the Misuse of Psychiatry, 2 J. Legal Med. 18, 58–60 (1980); on Herrin, *see* W. Gaylin, *The Killing of Bonnie Garland* (1982).

**16.** This view of human nature links such disparate psychologies as psychoanalysis, *see, e.g.,*

S. Freud, "Introductory Lectures on Psychoanalysis, Sixth Lecture," Complete Psychological Works of Sigmund Freud, Standard Edition, and behaviorism, *see* B. Skinner, *Beyond Freedom and Dignity,* 1–23 (1972).

medical, concept and which means, in effect, that someone cannot be found guilty—as being the same thing as mental illness, then the administration of criminal justice would be handed over to the expert psychiatric witness. Worse, the very idea of guilt would be corroded. For what makes an illness an illness is, often, just the fact that it is abnormal and socially detrimental. However, it is exactly the combination of abnormality and social detriment that, by and large, leads to the social decision to classify certain acts as criminal. While illness and criminality are analogous concepts, the fact that they are used in two different functional systems (medicine and law) indicates that these concepts cannot meaningfully be merged. Unless our society is careful to maintain the distinction between mental illness (a medical concept) and insanity (a legal concept), we will arrive at a point at which all persons who commit criminal acts will be deemed ill, simply by virtue of having committed criminal acts. At that point, presumably, the criminal justice system would vanish, leaving behind only a system of state-sponsored therapeutic intervention.[17] Whether such an outcome would be a good or a bad thing is not the issue here; the only point that need be made is that our society has not chosen such a system for coping with those who violate its laws.

It must therefore be concluded that the difference between sanity and insanity is not resolved by asking whether a defendant's acts were willed or compelled. Nor does the difference lie in the harshness of the sanction that can be imposed. It is far from certain that a person who pleads not guilty, is tried and convicted, and is then sentenced to a period of incarceration will serve more time in prison than a person who, faced with the same indictment, pleads not guilty by reason of insanity, is tried and acquitted, and is then committed to a psychiatric facility will spend there. See *Jones v. United States,* —— U.S. ——, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

Furthermore, it is not necessarily more stigmatizing to be found criminally liable than it is to be found insane. Neither of those of comparisons explains why we think of some persons as "guilty" and of some as "not guilty by reason of insanity."

Indeed, the very question of sanctions is not the appropriate one to raise in seeking to distinguish sane from insane. That is why the Government's analysis of the five objectives of the criminal justice system, objectives realized in terms of sanctions, is, ultimately, beside the point.

In sentencing a criminal defendant after conviction, the court properly considers what pressures can be brought to bear in the name of society that will benefit the community, whether by assuaging its feelings of outrage or by influencing the behavior of other members of society or by modifying the defendant's own behavior. In convicting a defendant, however, a jury undertakes a very different task; it makes a finding of guilt.

The finding of guilt has often been misunderstood. To some extent, the jury that finds a defendant guilty finds that he did those acts with which he has been charged. But that description does not exhaust what we mean when we speak of a finding of guilt.

The idea of guilt is not, of course, originally a legal concept. Apart from its meaning at the bar, guilt has an important place in society. The ability of members of society to rely on their fellow citizens to engage in everyday activities in predictable, normal ways—that is, in civilized fashion—depends upon the capacity of individuals to recognize their own moral transgressions and respond by feeling guilt. Indeed, our society could not long survive if most of its citizens were incapable of feeling guilt, for guilt is what prevents individuals from committing those acts that would undermine society. In the absence of guilt, socie-

---

**17.** The other possibility—equally absurd—would be the replacement of the medical system by an extension of criminal sanctions to those persons suffering from what we now think of as "illness." Both of these fantastic possibilities were, of course, explored by Samuel Butler in *Erewhon* (1872). *See* note 23, *infra,* and accompanying text.

ty would have to maintain steady, certain threats and impose constant, severe sanctions. Guilt, in short, reflects the individual's ability to gauge the moral character of his own acts.

In the modern day, the sentencing judge, as already noted, asks himself what external pressures can be brought to bear upon the convicted defendant in order to achieve one or another purpose of the criminal justice system. The jury does not ask itself that question. Rather, the jury asks itself whether the defendant ought to feel guilt— whether, in short, the defendant ought to be instructed, in the name of society, to face the *internal* pressure of a recognition of his own immorality. All that the jury can impose upon the defendant, apart from committing him to the judge's disposition, is the judgment of society that one who has acted as the defendant has acted ought to regard himself as guilty.[18]

Because of the moral character of the jury's findings, because it represents such a significant social intrusion into the life of the person who stands accused, our legal system has sought to ensure that the jury will determine guilt only where it can comprehend the defendant's understanding of his acts. As the jury may ultimately have to determine that the defendant ought to feel guilt, the jury must be confident that it can understand *how* the defendant thinks and feels. The jury's *comprehension* does not amount to *condonation* of the defendant. On the contrary, the jury's understanding of the defendant may lead to the harshest condemnation of the accused. The jury's verdict constitutes a determination that the defendant ought to feel guilt; thus, our law limits the jury's consideration to those cases in which an understanding of the defendant sufficient to make that determination can be achieved.

The legal condition of insanity, then, occurs when the state of the defendant's mind is such that it is alienated from ordinary human experience. We cannot understand the outlook of the insane person; the barrier of mental disease or defect interrupts the possibility of the jury's comprehension.[19] Faced with such a defendant, modern society has determined that a judgment of conviction would be a travesty of the ideal of justice that inspires our criminal law.

Accordingly, society has established the insanity defense. In putting forward that defense, the accused claims that the state of his mind at the time of the offense with which he is charged was such that the jury, composed of persons with the normal array of human experiences, could not comprehend his view of the world at that moment. If the jury acquits the defendant by reason of insanity, it acknowledges that its understanding of the accused was indeed blocked by the presence of mental abnormality. If the jury convicts despite the defense of insanity, it has found that, though the defendant's situation may have been different from anything members of the jury had experienced, it was not beyond the range of their comprehension.

## V.

That, then, is the setting within which the insanity defense must be located. When the insanity defense is properly before it, the jury is called upon to consider whether the defendant's mental state at the time of the alleged offense can be comprehended by the jury. The role of the psychiatrist in assisting that inquiry must be a limited one. From his experience with mental illness, the psychiatrist may be able to sharpen the jury's appreciation of the variety of mental conditions and the nature of the diseased or defective mind. Indeed, the psychiatrist may, in some cases, be better able than the defendant to describe the state of mind of the defendant at the relevant time. But the crucial point must be

---

**18.** Indeed, it has been said that the essence of the modern concept of criminal justice lies in the ideal of penitence (whence the "penitentiary") as a substitute for the older emphasis on corporal punishment. *See, e.g.,* M. Foucault, *Discipline and Punish: The Birth of the Prison* (1979).

**19.** For a sociologist's discussion of a conception of "mental illness" (and "insanity") as incomprehensibility, written from a cross-cultural perspective, *see* A. Horwitz, The Social Control of Mental Illness 13–21 (1982).

remembered: the psychiatrist (or other mental health specialist) is called to the stand to aid the jury's determination of whether the defendant's state of mind is amenable to comprehension by the jury, so that the jury can make a finding of guilt. The psychiatrist is not called to offer his opinion as to the defendant's guilt, to characterize (in a usurpation of the jury's function) that state of mind as beyond lay comprehension, or to suggest that the defendant lacked control over his actions.

■ This court thus concludes that, when a defendant files a notice of intention to introduce expert testimony regarding mental disease or defect, it is appropriate for the court to consider whether the type of disease or defect alleged by the defendant is sufficient to constitute an allegation of insanity. The allegation of disease or defect must amount to an allegation that at the time of the acts with which he has been charged the defendant's mental state was such that the jury could not comprehend it; otherwise, expert testimony concerning the alleged disease or defect would be irrelevant to the question before the jury.

The burden our system of criminal justice places upon the jury is an extraordinary one. The basic physical obligations are usually inconvenient, often onerous. The jury's attention is strained by lengthy proceedings, its understanding confounded by arguments couched in a strange tongue. Finally, we ask of our jurors that they undertake the monumental exercise described above when they pass upon the guilt or lack of guilt of a defendant. Aware of all that, a court cannot easily impose new obligations—of the sort that would come into play in connection with an insanity defense based on "compulsive gambling disorder"—upon the jury.

Of course, the pre-eminent concern of the criminal justice system is the procedure due the defendant, who risks most in his appearance before the court. But awareness of the rigors already bound up in the jury's task must make a court scrupulous in deciding whether any new burden to be placed upon the jury is genuinely necessary to guard the defendant's rights.

■ That concern is heightened when the added burden proposed is that of psychiatric testimony. The introduction of such testimony, as already suggested, poses a significant risk of confusing the jury about the nature of guilt and the place of the jury in determining the defendant's guilt or lack of guilt. Moreover, it has been widely and persuasively argued that subjection of psychiatric testimony to the rough processes of the adversary system should, unless required, be avoided.[20] Casual reliance upon expert testimony regarding mental illness has led to the battles of psychiatric witnesses that our nation's courts have seen over the past several years. Such conflicts undermine public confidence in psychiatry as well as law, while distorting the psychiatric information that the court may need to consider at the time of sentencing. Hence, unless the court concludes that the need for expert testimony meets the criteria stated above, such testimony should be excluded.[21]

## VI.

In the case at bar, the United States has, along with the more sweeping motion already discussed, filed a Motion in Limine to Exclude Any Expert Testimony Regarding the Defendant's Alleged Mental Disorder "Compulsive Gambling."[22] The APA, as noted above, defines "compulsive gambling disorder" as "a chronic and progressive failure to resist impulses to gamble," DSM III, at 292.

The defendant in this case is not, of course, charged with gambling; he is charged with the interstate transportation of stolen goods. Nonetheless, the defendof admission of expert testimony. First, he argues that compulsive gambling disorder

---

20. *See, e.g.,* Halpern, *supra* note 15, at 50–60; Gaylin, *supra* note 15; Kaufman, *supra,* note 11.

21. That testimony would be available at sentencing. This arrangement approaches the bifurcated trial procedure in use in California.

22. *See* notes 1 and 2, *supra.*

is a mental disease, the result of which may be that the sufferer is unable to conform his conduct to the requirements of law. Thus, argues the defendant, a defense of insanity may be based on compulsive gambling disorder. Second, the defendant relies on cases holding that the question of whether a defendant suffers from a mental disease or defect is a question for the jury's determination and that, in aid of that determination, trial courts should liberally permit introduction of expert testimony.

The standard proposed by the defendant, however, is far too lax. It is questionable whether compulsive gambling disorder ought even to be the basis for an insanity defense when the offense charged is gambling. The defendant, though, would go much farther: he would have a putative disorder characterized chiefly by repetition of one kind of conduct become the basis for a conclusion that, in engaging in another kind of conduct, the defendant's mental state amounted to insanity. That relationship is too tenuous to warrant the introduction of expert witnesses.

This conclusion, which this court is not alone in reaching,[22] is compelled by a recognition of the drastic expansion of the insanity defense threatened by the defendant's argument. Were the court to accept the defendant's proposed extension of the law, there would be no logical reason why alcohol or drug addiction would not form the basis for an insanity defense to any indictment, whether one for tax fraud, firearms possession, false statement, assault, kidnapping, or murder. The consequence of such a position would be an explosion in the amount of psychiatric testimony offered at criminal trials; it would also tend to redefine the criminal law as a system of therapy (biological or psychiatric) devoid of individual moral judgments. Just as this court has already declined to overturn the implicit assumptions of Congress and the Supreme Court by "abolishing" the insanity defense, it does not consider as an appropriate exercise of its authority the momentous expansion of the defense urged by this defendant.[24]

During the course of hearings on the Government's *in limine* motion, considered

23. *See United States v. Lewellyn,* Crim. No. 82–43 (S.D.Iowa, Aug. 16, 1982), reproduced in this record as Appendix IV, Part 6 to Government's "Brandeis-Brief." *See* note 2 *supra.*

24. The fact that certain conduct may be defined as a "disorder" by the mental health professions—and, indeed, formally classified as a "disorder" in the DSM–III—does not necessarily make that conduct a "mental disease" or "mental disorder" that can be the basis of a defense of insanity. Professor Jay Katz of the Yale Law School, one of the nation's preeminent authorities in this field, observed at the hearing on these motions that

> [i]f you look at DSM–III in terms of its classification, you can classify all of us under one rubric or another of mental disorder.
> I haven't studied DSM–III as carefully, but under DSM–II I called myself a psycho-thymic personality. That was the diagnosis I liked for myself because it says, among other things, that this is a person who . . . at times [is] a little bit happy, at other times . . . a little bit sadder, and that the happiness and sadness is also affected by external circumstances.
> Well, I'm a fit candidate for that diagnosis. You *can find a diagnosis for anyone* [in DSM–III].

> * * * * * *
> *[I]f you take the concept of mental disease, if you employ it very broadly, then, of course, compulsive gambling and almost everything can be included under the concept of mental disease.*
> * * * * * *
> If one were to include everything in DSM–III as mental disease for criminal law purposes, then in theory I would argue every criminal defendant would be eligible to raise the insanity defense. Not that everybody would, but in theory everybody could, because I think there are very, very few people who fall outside the net of DSM–III with respect to the question of mental disease.

Certified Official Transcript of Hearing of June 29, 1983 on the Insanity Defense at 567–568, 586 (emphasis supplied).

The mere fact that the mental health professions are able to describe and classify conduct for diagnostic purposes—for example, the fact that certain conduct (such as "compulsive gambling") has been included in DSM–III or any similar professional effort to describe and classify human behavior—cannot be the basis for the invocation of the insanity defense. *See* note 17 *supra,* and accompanying text.

along with the Government's motion to reconsider the law of insanity, the court has learned nothing that would suggest that the defendant, even if he could *potentially* assert a defense of insanity in response to a charge of illegal gambling, may *actually* assert that defense to the acts with which he is in fact charged in this case. Supposing that he was entirely unable to resist his impulse to gamble, it would follow only that he would have enormous debts. It would not then necessarily follow that his only recourse would be to the transportation of stolen goods. Indebtedness itself cannot be said to compel conduct. Unless the defendant could show that his insanity had a *direct* bearing on his commission of the acts with which he is charged, any psychiatric evidence he might seek to introduce would have to be excluded as irrelevant. The defendant has not offered to introduce expert testimony on compulsive gambling for the purpose of showing such a direct connection.

Under these circumstances, the court concludes that the defendant could enjoy no advantage from testimony regarding his compulsive gambling, except such impermissible leverage as he might obtain from jury confusion. To forestall such confusion, the court holds that the expert testimony proffered by the defendant shall be excluded.

### CONCLUSION

For the foregoing reasons, the Government's Motion to Reconsider Law of Insanity is denied, and the Government's Motion in Limine to Exclude Any Expert Testimony Regarding the Defendant's Alleged Mental Disorder "Compulsive Gambling" is granted.[25]

It is so ordered.

25. Thus, the evidence of insanity that the defendant may present at trial will be limited to that covered by his offer of proof, other than that which is excluded as a consequence of this court's granting of the Government's *in limine* motion. In short, the defendant will be able to

offer expert testimony concerning his characterological disorder, as diagnosed by Dr. Cegalis, to the extent that that disorder existed at the time of his commission of the acts with which he is charged in the indictment. *See* note 7, *supra*.