UNITED STATES of America, Appellee,

v.

Gary Vance LEWELLYN, Appellant.

No. 82–2416.

United States Court of Appeals,
Eighth Circuit.

Submitted May 19, 1983.

Decided Dec. 21, 1983.

Richard C. Turner, U.S. Atty., S.D. Iowa, Des Moines, Iowa, for appellee.

David M. Barrett, Joseph E. Schuler, Barrett, Hanna, Daly & Gaspar, Washington, D.C., Robert J. Baudino, Jr., Neiman, Neiman, Stone & Spellman, P.C., Des Moines, Iowa, for appellant.

Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.

FAGG, Circuit Judge.

Gary Lewellyn, a Des Moines stockbroker, was indicted on nine counts of embezzlement, 18 U.S.C. § 656, three counts of making a false statement, 18 U.S.C. § 1014, and three counts of mail fraud, 18 U.S.C. § 1341, for converting over $17 million in money and securities from two Iowa banks. In response to the government's pretrial motion the district court ruled that Lewellyn could not rely on a defense of insanity by reason of pathological gambling and excluded evidence related to that defense. Lewellyn then waived a jury trial and was convicted on all counts following a trial to the court based primarily on stipulated evidence. On appeal Lewellyn contends that the district court committed error in precluding his insanity defense. We affirm.

■ As a preliminary matter, we decline the government's invitation to modify or abandon the American Law Institute (ALI) insanity test as adopted by this court in *United States v. Frazier,* 458 F.2d 911 (8th Cir.1972):

(1) A defendant is insane * * * if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct. Model Penal Code § 4.01 (Final Draft 1962).

*Id.* at 918 (footnote omitted). As a panel we are without authority to modify the insanity standard established in this circuit. Only the court *en banc* is empowered to change an existing rule of law. *See United States v. Howard,* 706 F.2d 267, 269 (8th Cir.1983). Consequently, the *Frazier* test provides the framework for our decision in the present case.

Lewellyn does not contend that he suffered a mental condition which entailed a lack of substantial capacity to appreciate the wrongfulness of his conduct. Rather, he claims that he should have been allowed to present evidence that as a pathological, or compulsive, gambler he lacked substantial capacity to conform his conduct to the requirements of law. Of necessity, his position is that not only did his mental condition render him unable to abstain from gambling, but that he also lacked substantial capacity to avoid breaking the law to obtain the funds required for gambling.

The district court held a pretrial hearing that emphasized three questions: (1) whether pathological gambling is a mental disease or defect within the meaning of the ALI rule, (2) whether a pathological gambler is unable to resist impulses to gamble, and (3) whether a pathological gambler lacks substantial capacity to refrain from engaging in criminal activity such as embezzlement and similar offenses. At the hearing Lewellyn introduced as an exhibit the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM–III) published by the American Psychiatric Association, in which pathological gambling is classified and described as a disorder of impulse control. In addition Lewellyn adduced expert testimony which indicated that pathological gambling, although classified as a mental disorder, is the equivalent of a mental disease within the meaning of the ALI insanity rule. Lewellyn's expert witnesses further testified that some pathological gamblers are unable to refrain from gambling and that some pathological gamblers are unable to resist engaging in criminal activities to support their gambling compulsion. Lewellyn does not argue on appeal that the pretrial hearing was an improper method for determining whether he should have been allowed to rely on a defense of insanity at trial.

The district court observed that factual issues had been raised on the three questions that had been the subjects of the pretrial hearing and noted that perhaps these factual issues should be presented to a jury by allowing Lewellyn to rely on an insanity defense at trial. The district court was concerned, however, with the relationship between the mental condition asserted, pathological gambling, and the crimes charged. Accordingly, the district court noted that to allow the insanity defense in this case would amount to "a revolutionary expansion of the defense of insanity * * * " and held "that a defense of insanity, based upon a disorder of impulse control in the form of pathological gambling, is not available to a Defendant charged with embezzlement even if there is evidence which would support a finding that he lacked substantial capacity to conform his conduct to the requirement[s] of the law." The district court then granted the government's motion to exclude evidence pertaining to a defense of insanity by reason of pathological gambling.

As the district court recognized, the central question in this case is the link between

pathological gambling and criminal activity such as embezzlement. We will therefore make some assumptions for the sake of discussion and put aside some issues that need not be addressed in this case. We will assume that Lewellyn is himself a pathological gambler. We will also assume for purposes of this case that some pathological gamblers are unable to resist impulses to gamble. We are able to glean from the record that the largest share of the embezzled funds was used to finance stock and commodities speculation through various brokerage house accounts under Lewellyn's control, and we will assume that his speculative endeavors constituted gambling behavior.

■ The district court held as a matter of law that in a prosecution for embezzlement a defendant may not rely on a theory of insanity by reason of pathological gambling, and accordingly precluded evidence to support this theory, even after the court concluded that Lewellyn had made a sufficient showing that a pathological gambler charged with embezzlement fits within the language of the ALI rule. In our view, however, this case may be resolved without reaching the question whether as a matter of law such a limitation should be placed on the availability of the insanity defense. Hence, while we agree with the result reached by the district court, we note the well-established rule that we may affirm on any ground supported by the record, even though that ground was not relied on by the district court. *See Blum v. Bacon,* 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 2359 n. 5, 72 L.Ed.2d 728 (1982); *Brown v. St. Louis Police Department,* 691 F.2d 393, 396 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983).

■ We have recognized that in order to raise the issue of insanity a defendant must make a minimum showing. A defendant is presumed sane, but the introduction of evidence of insanity dispels the presumption and subjects the prosecution to the burden of proving sanity beyond a reasonable doubt. *United States v. Dresser,* 542 F.2d 737, 742 (8th Cir.1976), *citing Davis v. Unit-*

*ed States,* 160 U.S. 469, 486–88, 16 S.Ct. 353, 357–58, 40 L.Ed. 499 (1895). In *Dresser* we referred to this threshold showing as a "prima facie case of insanity." 542 F.2d at 742 n. 7.

We have not decided whether evidence of pathological gambling is evidence of insanity which will permit a defendant to rely on an insanity defense at trial. In *United States v. Gilliss,* 645 F.2d 1269 (8th Cir. 1981), the defendant was convicted on charges of kidnapping and interstate transportation of a stolen vehicle in a jury trial at which he presented a defense of insanity by reason of pathological gambling. On appeal Gilliss contended that the trial court committed error in denying his motion for judgment of acquittal, arguing that the government had failed to sustain its burden of proving sanity beyond a reasonable doubt. We assumed that the evidence of insanity offered by Gilliss was sufficient to shift the burden of proving his sanity to the government and concluded that the government had produced sufficient evidence to allow the jury to find him sane beyond a reasonable doubt. We specifically noted that in view of our finding sufficient evidence of sanity we were not required to "address the adequacy of the evidence produced by the defense." *Id.* at 1277 n. 20. Our comment in *Gilliss* that "submission of the insanity question to the jury was proper," *id.* at 1277, meant only that the government's evidence of sanity was adequate to survive a motion for judgment of acquittal.

■ In the present case we need not decide whether pathological gambling may never be grounds for an insanity defense. In the particular circumstances of this case we are concerned with the connection between pathological gambling and collateral criminal activity. To make the required minimum showing of insanity Lewellyn had to show that at least some pathological gamblers lack substantial capacity to conform their conduct to the requirements of laws prohibiting criminal activities like embezzlement. We now turn to the record to determine whether Lewellyn made a showing

which would have allowed him to rely on an insanity defense at trial.

DSM–III contains the following description of pathological gambling:

The essential features are a chronic and progressive failure to resist impulses to gamble and gambling behavior that compromises, disrupts, or damages personal, family, or vocational pursuits. The gambling preoccupation, urge, and activity increase during periods of stress. Problems that arise as a result of the gambling lead to an intensification of the gambling behavior. Characteristic problems include loss of work due to absences in order to gamble, defaulting on debts and other financial responsibilities, disrupted family relationships, borrowing money from illegal sources, forgery, fraud, embezzlement, and income tax evasion.

Commonly these individuals have the attitude that money causes and is also the solution to all their problems. As the gambling increases, the individual is usually forced to lie in order to obtain money and to continue gambling, but hides the extent of the gambling. There is no serious attempt to budget or save money. When borrowing resources are strained, antisocial behavior in order to obtain money for more gambling is likely. Any criminal behavior—e.g., forgery, embezzlement, or fraud—is typically nonviolent. There is a conscious intent to return or repay the money.

*Id.* at 291. The diagnostic criteria for pathological gambling included in DSM–III are:

A. The individual is chronically and progressively unable to resist impulses to gamble.

B. Gambling compromises, disrupts, or damages family, personal, and vocational pursuits, as indicated by at least three of the following:

(1) arrest for forgery, fraud, embezzlement, or income tax evasion due to attempts to obtain money for gambling

\*     \*     \*     \*     \*     \*

C. The gambling is not due to Antisocial Personality Disorder.

*Id.* at 292–93.

The language of DSM–III does not establish that pathological gamblers may lack substantial capacity to refrain from engaging in embezzlement and similar criminal activities. Portions of DSM–III no doubt indicate that criminal activity is often associated with pathological gambling. DSM–III does not state, however, that pathological gamblers who engage in criminal conduct do so because they lack substantial capacity to conform their conduct to the requirements of law, nor does it state anything of equivalent meaning. It is not remarkable, though, that the language of DSM–III does not conform to the legal principles embodied in the ALI insanity rule.

The purpose of *DSM–III* is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat various mental disorders. The use of this manual for nonclinical purposes, such as determination of legal responsibility, competency or insanity \* \* must be critically examined in each instance within the appropriate institutional context.

*Id.* at 12. When we examine DSM–III carefully within the context of the criminal law we conclude that its language does not establish a relationship between pathological gambling and criminal activity sufficient to constitute insanity under the ALI standard. As a consequence, DSM–III does not alone supply the minimum showing Lewellyn was required to make before he could rely on an insanity defense.

Expert testimony adduced by Lewellyn, couched in terms more like those of the ALI insanity rule, does suggest the requisite connection between pathological gambling and criminal activity because it supports the proposition that some pathological gamblers lack substantial capacity to resist engaging in embezzlement and similar offenses. Dr. Julian Taber, a psychologist, testified that in some instances pathological

gamblers are incapable of conforming their conduct to the requirements of law, and are unable to avoid behavior such as forgery, fraud, and embezzlement. Dr. Robert Custer, a psychiatrist, testified that in the late stage of pathological gambling individuals are unable to resist activities like embezzlement or fraud because they have to gamble and they have to obtain money in order to gamble.

Lewellyn is dependent on this scientific expert testimony to sustain his burden of making the required minimum showing that would permit him to rely on an insanity defense at trial. The expert testimony is essential because it supports a proposition not established in DSM–III: that some pathological gamblers lack substantial capacity to refrain from committing embezzlement and similar offenses. We note, however, that established principles control admissibility of scientific evidence. "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). In deciding whether a scientific principle meets the *Frye* standard we have recognized reliability as "one of the most important factors" that should be considered. *United States v. Alexander,* 526 F.2d 161, 163 (8th Cir.1975). Because our analysis of the *Frye* rule would govern the admission at trial of expert testimony similar to that given at the pretrial hearing, this analysis is equally applicable in determining whether expert testimony adduced by Lewellyn is sufficient to constitute the required minimum showing of insanity.

Pathological gambling has received relatively little scientific attention. Dr. Custer testified that pathological gambling has only recently been recognized as a disease. Both Dr. Taber and Dr. Custer cited the inclusion of pathological gambling in DSM–III, published in 1980, as evidence that the condition is generally accepted as a mental disease by mental health professionals.

Pathological gambling was not listed, however, in DSM–II, published in 1968.

From the testimony at the pretrial hearing it is apparent that few psychologists or psychiatrists have had much experience dealing with pathological gamblers. Dr. Taber estimated that there may be perhaps 20 psychologists with some in-depth experience working with pathological gamblers, but he said that to his knowledge he was the only psychologist devoted full-time to their treatment. Dr. Taber knew of no psychiatrist who would work full-time with pathological gamblers. Dr. Custer stated that probably not more than 20 or 25 doctors have had experience with pathological gambling.

There is accordingly little knowledge about pathological gambling within the community of mental health professionals. Dr. Taber testified that in talking with physicians, social workers, and psychologists, he had "found very prevalent ignorance or just lack of concern with the problem." Dr. Custer indicated that it is necessary to spend a significant amount of time working with pathological gamblers in order to understand the problem "because it is so new and there is so very little that has been known about it." Dr. Custer said he does not think many doctors know about pathological gambling, and that as a result they do not recognize it as a disease.

In order to make the necessary minimum showing of insanity Lewellyn was required to demonstrate that there is general acceptance in the fields of psychiatry and psychology of the principle that some pathological gamblers lack substantial capacity to conform their conduct to the requirements of laws prohibiting embezzlement and similar offenses. There is no evidence in the record, however, either in DSM–III or the expert testimony, that this principle is generally accepted in the mental health professions. Indeed, the record shows that the pathological gambling disorder itself has only recently been recognized in DSM–III, and that there is scant experience and limited knowledge concerning this problem. In .

our view, Lewellyn has failed to show that the opinions espoused by his expert witnesses possess the requisite indicia of scientific reliability.

Because we find that Lewellyn did not make the required minimum showing of insanity, we affirm the district court's exclusion of evidence pertaining to a defense of insanity by reason of pathological gambling.