**Alfred Neil KRAMER**

v.

**UNITED STATES of America.**

Civ. A. No. N 81–2526.

United States District Court,
D. Maryland.

Feb. 15, 1984.

Joseph F. Murphy, White & Murphy, Towson, Md., for petitioner.

J. Frederick Motz, U.S. Atty., D. Md., and Lawrence L. Hooper, Jr., Asst. U.S. Atty., Baltimore, Md., for respondent.

NORTHROP, Senior District Judge.

On October 2, 1981, Petitioner Kramer filed a Petition for Writ of Error *Coram Nobis* ("Petition") seeking an Order vacating two guilty pleas entered in 1974 and 1977. The Government responded in February, 1982, and after discovery was completed, the Court, in December, 1983, held an evidentiary hearing. Now, after having considered all submissions of the parties, oral argument, and post-hearing memoranda, the Court finds the evidence insufficient to support a judgment for Petitioner. For the reasons herein set forth, the instant petition is denied.

█ *Coram nobis* is an extraordinary remedy to be granted only under compelling circumstances to correct errors of the most fundamental nature. *See e.g., United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *Correa-Negron v. United States,* 473 F.2d 684 (5th Cir.1973).

To obtain relief under this writ, the Petitioner must establish his right thereto by a preponderance of the evidence. *Hayes v. United States,* 468 F.Supp. 179, 185 (S.D. Tex.1979). A presumption of regularity attaches to the criminal conviction being challenged. *Morgan,* 346 U.S. at 512, 74 S.Ct. at 253.

BACKGROUND

On April 1, 1974, Petitioner pled guilty to conspiring to distribute cocaine. He was sentenced to incarceration for 364 days and a term of special parole. On July 7, 1977, Petitioner entered a guilty plea for unlawfully distributing phencyclidene ("PCP"). Sentencing was postponed to allow Kramer time to undergo treatment for his drug abuse problem and emotional difficulties, and to present the results of the treatment at sentencing. Petitioner, on October 6, 1977, was sentenced to incarceration for two years with three years special parole.

Petitioner seeks to vacate these pleas and convictions. Newly discovered evidence, he submits, demonstrates he was suffering from an Episodic Behavioral Disorder at the times he entered guilty pleas, and at both sentencings. His illness allegedly rendered him legally insane and thus not criminally responsible for his actions. He requests a new trial in each criminal case so a jury may determine whether he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.*

Prior to the rearraignment and sentencing hearing in 1977, Petitioner, at the request of the federal public defender's office, underwent a psychiatric evaluation by Dr. Barry Rudnick. The doctor stated that Petitioner did in fact suffer from a mental disease or defect. His diagnosis of Kramer was: depressive neurosis; drug dependence; and possible epilepsy. He concluded, however, that Kramer was not mentally incompetent, and was fully able to assist in

---

* Petitioner is especially interested in expunging his convictions from the record because of his desire to enroll in law school. He contends the University of Baltimore School of Law rejected his admission application because of the convictions.

his own defense and understand the significance of the legal proceedings in which he was involved.

The doctor believed Petitioner suffered from a depression that "may have contributed to his poor judgment in selling drugs to the undercover agents." It did not appear to Dr. Rudnick that Kramer lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

In August, 1979, Petitioner contacted Bruce L. Regan, M.D., a psychiatrist experienced in the treatment of episodic behavior disorders. According to Dr. Regan, Petitioner suffered from a neurological behavior disorder called Episodic Dyscontrol Syndrome. In addition, Dr. Regan's diagnosis included the condition Intermittent Explosive Disorder. These disorders, in Dr. Regan's opinion, rendered Petitioner legally insane at the time of his offenses and during the judicial proceedings, because he was unable to conform his conduct to the requirements of the law.

Episodic Dyscontrol Syndrome (hereinafter sometimes referred to as "EDS") and Intermittent Explosive Disorder (hereinafter sometimes referred to as "IED") are types of episodic behavioral disorders. In 1981, the Diagnostic and Statistical Manual of Mental Disorders—III ("DSM–III") the official psychiatric manual, recognized IED as a mental condition. Episodic Dyscontrol Syndrome was first described in medical literature by Dr. Russel R. Monroe. *See* Monroe, *Episodic Behavioral Disorders: An Unclassified Syndrome*, in 3 American Handbook of Psychiatry (S. Arieieti 2d ed. 1974). Unlike IED, however, EDS has not been officially classified.

THE EVIDENCE

In court, Dr. Regan recounted the details of Petitioner's background: the tumultuous, discordant home environment; the frequent fighting and the traumatic head injury suffered as an adolescent; the abnormal EEG; the two month period of "AWOL" from the U.S. Army; the frequent citations for speeding and Petitioner's failure to answer charges; and, of course, the scheming, plotting and traveling that accompanied the abuse and distribution for sale of dangerous drugs. This conduct, according to Dr. Regan, was consistent with his diagnosis of Episodic Dyscontrol Syndrome and Intermittent Explosive Disorder. Petitioner's frequent and long-lived abuse of LSD, PCP, heroin, cocaine and marijuana, concluded Dr. Regan, were simply psychopharmaceutical attempts to self-medicate himself. Dr. Regan pointed to the complete remission of Petitioner's symptomotology, and abatement of his antisocial conduct that resulted from the administration of megadoses of the drug propranolol. Petitioner's request for new trials at which he may raise anew the insanity defense using this newly acquired psychiatric understanding of his mental condition is supported solely by Dr. Regan's findings.

Because of these findings, and the filing of the instant action, the Government, in July, 1983, requested that Dr. Rudnick re-examine Kramer to determine whether his opinion had changed with respect to Petitioner's mental condition in 1977. Dr. Rudnick found Petitioner's history "consistent with the diagnosis of an intermittent explosive disorder." Report of Dr. Rudnick dated July 29, 1983. His opinion, however, regarding Kramer's sanity during the 1970s remained unchanged: "Mr. Kramer did have substantial capacity to have appreciated the criminality of his conduct and to have conformed his conduct to the requirements of the law in regards to both drug related offenses of which he was ultimately convicted." *Id.*

Petitioner accurately points out that Dr. Rudnick's more recent diagnosis includes Intermittent Explosive Disorder "by history." The mere listing of Intermittent Explosive Disorder, however, does not persuade the Court to adopt Dr. Regan's analysis, particularly in light of Dr. Rudnick's testimony. When asked about the significance of his having included Intermittent Explosive Disorder in his diagnosis, Dr. Rudnick replied that he had considered IED in light of Dr. Regan's workup. Dr. Rudnick stated that his diagnosis of IED was

weak and further, that given the Petitioner's symptoms and Dr. Regan's report, he did not believe Kramer suffered from Episodic Dyscontrol Syndrome. Although his respect for Dr. Regan prompted him to consider IED, Dr. Rudnick reluctantly noted that Dr. Regan, in his zeal, has a propensity to "overdiagnose."

When Dr. Rudnick examined Petitioner in 1977, he was aware of the condition now called Episodic Dyscontrol Syndrome and did not feel there was a strong case for it. If, indeed, Kramer did have that condition, added Dr. Rudnick, it would nevertheless not have affected his conduct. Thus, he did not consider it. While Intermittent Explosive Disorder was recognized in DSM–III, Episodic Dyscontrol Syndrome was specifically rejected as too speculative and broad a category. Dr. Rudnick noted that a great deal of disagreement surrounds the characterization of EDS and the condition has not received general acceptance. Whereas IED can actually be diagnosed, EDS is abstruse, difficult to diagnose, and resembles many other conditions.

Intermittent Explosive Disorder is characterized by discrete episodes of loss of control of aggressive impulses that result in violent outbursts and by violent behavior that is grossly out of proportion to the patient's previous behavior. Such behavior often results in serious assaults or destruction of property. DSM–III, Section 312.34, at 295.

Similarly, Episodic Dyscontrol Syndrome has been associated with impulsive behavior:

> ... the diagnosis of the episodic sociopathic reaction must be made carefully, and should be limited to the occasional patient who shows "bursts" of sociopathic behavior which completely overshadows other episodic behavior, such behavior being totally out of character for the individual, except for brief and infrequent intervals ...

Monroe, *supra*, at 248.

As Dr. Rudnick testified, even assuming Petitioner suffered from Intermittent Explosive Disorder, or Episodic Dyscontrol Syndrome, there is no nexus between those conditions and the acts for which Petitioner was convicted. His actions were neither impulsive nor episodic. He was not charged with assault or destruction of property. To the contrary, the extent and duration of Kramer's drug abuses and his elaborate planning, covert meetings and concerted activity in which he plotted drug deals, are markedly similar in their continuousness, premeditation, consistency and deliberateness. When asked to explain the obvious discrepancy between his diagnosis and Petitioner's behavior, Dr. Regan stated that this activity supported his theory that Kramer was unable to conform his conduct to the requirements of the law. As to the consistency, rather than impulsivity, of Kramer's conduct, Dr. Regan remarked that he was not in complete agreement with Dr. Monroe's description of Episodic Dyscontrol Syndrome. Again, he pointed to Kramer's dramatic response to the beta-blocking medication and Kramer's EEG that showed a discharge consistent with an epileptic disorder, which in turn was consistent with Episodic Dyscontrol Syndrome.

THE LAW

■ Court is sympathetic toward Petitioner's ardent and successful efforts to rehabilitate himself and his desire to divorce himself from his former undignified and antisocial behavior. Nevertheless, Petitioner's evidence is insufficient to support the issuance of the extraordinary writ of *coram nobis*.

On the one hand, the Court confronts the testimony and reports proffered by Dr. Rudnick, the original psychiatrist who saw Petitioner in 1977. He remains convinced of the accuracy of his initial conclusion that Kramer was mentally competent and responsible for his criminal acts. On the other hand, the Court confronts Dr. Regan's analysis, in which he judges Petitioner's competency for actions taken more than seven years ago. His opinion rests on his diagnosis of one recently classified mental disorder and one disorder yet too uncertain to receive official recognition.

There is a philosophic maxim called Ockham's razor that supports Dr. Rudnick's and the Court's position: it essentially means that the fewer assumptions used to explain a hypothesis, the more reliable the hypothesis. To arrive at the same conclusion as Dr. Regan, the Court must first be ready to make a number of assumptions based on Petitioner's medical and social history and on recently advanced theories in the field of psychiatry. It is more reliable to adopt an original opinion rendered close in time to the events in question than to make many assumptions based on an abstruse theory: "while courts will go a long way in admitting expert testimony deduced from well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). While the Court is not concerned with the admissibility of the evidence, *Frye* is relevant in that it guides the Court in assessing the weight to accord Dr. Regan's testimony. Given the lack of acceptance of Episodic Dyscontrol Syndrome, the Court views Petitioner's proffer with skepticism.

The Eighth Circuit recently had occasion to consider a case that raised similar issues and concerns. In *United States v. Lewellyn*, 723 F.2d 615 (8th Cir.1983), Lewellyn, a Des Moines stockbroker, appealed from the district court's ruling precluding him from entering a defense of pathological gambling. The appellate court affirmed, but for different reasons. It held it unnecessary to reach the question whether in a prosecution for embezzlement a defendant may rely on the theory of insanity by reason of pathological gambling. Rather, it held that pathological gambling had just been recognized as a disease in DSM–III, and "there is scant experience and limited knowledge concerning this problem .... Lewellyn has failed to show that the opinions espoused by his expert witnesses possess the requisite indicia of scientific reliability." *Id.*

This Court shares the same misgivings with respect to Episodic Dyscontrol Syndrome as did the *Lewellyn* court with pathological gambling. Further, despite Petitioner's protestations to the contrary, the granting of the writ would render the courts vulnerable to a floodgate of litigation in which petitioners would demand new trials and an opportunity to raise the issue of insanity by reason of Episodic Dyscontrol Syndrome. A condition that is difficult to diagnose and can explain away any kind of antisocial behavior could create havoc, especially with the insanity defense.

Petitioner has not proved, by a preponderance of the evidence, his entitlement to a writ of error *coram nobis*. Accordingly, the petition is denied. A separate Order will be entered in confirmation of the within decision.