**UNITED STATES of America, Appellee,**

v.

**John J. TORNIERO, Appellant.**

**No. 1082, Docket 83–1459.**

United States Court of Appeals,
Second Circuit.

Argued April 23, 1984.

Decided May 24, 1984.

Michael Hartmere, Asst. U.S. Atty., D. Conn., New Haven, Conn. (Alan H. Nevas, U.S. Atty., District of Connecticut, New Haven, Conn., of counsel), for appellee.

John J. Keefe, Jr., Lynch, Traub, Keefe & Snow, New Haven, Conn. (Hugh F. Keefe, Charles E. Tiernan III, New Haven, Conn., of counsel), for appellant.

Before KAUFMAN, MESKILL and NEWMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Once again we are called upon to consider an issue related to the insanity defense presenting a basic question fundamental to the very notion of criminal justice. *See United States v. Freeman*, 357 F.2d 606, 607 (2d Cir.1966). We decide today whether a trial judge can exclude an insanity defense based on compulsive gambling. Any issue involving insanity evokes extraordinary interest and, indeed, passion. Although the insanity defense is infrequently raised and rarely successful,[1] it remains of profound symbolic and philosophical importance as a reflection of society's conception of the nature of criminal responsibility and our understanding, however, imperfect, of the mysteries of the human mind.

Impetus for a variegated movement to change the law of insanity came from the controversial 1982 jury verdict acquitting, on insanity grounds, John W. Hinckley, the man accused of attempting to assassinate President Reagan. In the wake of the Hinckley decision, Congress has proposed legislative changes in the largely judge-made law of insanity in the federal courts;[2] state legislatures have revised or even eliminated the affirmative defense of insanity;[3] and professional groups, both medical

---

1. Empirical evidence suggests that fewer than one percent of criminal defendants plead insanity and only a fraction of these pleas result in a verdict of not guilty. *See, e.g.,* Pasewark, Insanity Plea: A Review of Research Literature, 9 J.Psych. & Law 357, 363–64 (1981).

2. Legislation is currently pending in both houses of Congress to eliminate the "volitional prong" of the definition of insanity now used in the federal courts, *see* Part II *infra*. The proposals would also provide for standardized procedures for confinement and treatment of those adjudged insane; shift the burden of proof so that the defendant would be required to prove insanity by a preponderance of the evidence;

and prevent mental health experts from expressing an opinion on the "ultimate issue" whether the defendant was insane. *See* S. 1762, 98th Cong.2d Sess. Title IV (1984); H.R. 3336, 98th Cong.2d Sess. (1984).

3. Two states permit evidence of insanity to be adduced only to negate the intent element of an offense. *See* Idaho Code § 18–207 (Michie Supp.1983); Montana Code Ann. § 46–14–102 (1983). Twenty-four states now require the defendant to prove insanity by a preponderance of the evidence, a procedure declared constitutional in *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). *See* H.Rep. No. 98–577, 98th Cong. 1st Sess. 14 (1983). New

and legal, have called for a new approach to the insanity defense.[4] For purposes of this appeal, we note that the definition of insanity we adopted in *Freeman*, see Part II *infra*, remains the law of this circuit and furnishes the basis of our conclusion that the trial court was not required to permit a defense such as the one proposed here. Before proceeding with our legal analysis, we briefly recapitulate the relevant facts.

## I.

In September 1982, John J. Torniero, a jewelry store manager, was indicted for interstate transportation of jewelry allegedly stolen from his employer. When Torniero's disclosure of psychological reports pursuant to Fed.R.Crim.P. 16(b)(1)(B) indicated he would attempt to argue that a compulsion to gamble rendered him legally insane, the Government, admittedly motivated by the adverse reaction to the recently-conducted Hinckley trial, sought an un-precedented judicial ruling. The United States asked the district judge to reverse centuries of legal tradition and institute change so radical that only two states have so far adopted it: abolition of the insanity defense. In the alternative, the prosecution sought more limited relief, seeking a ruling excluding any evidence related to compulsive gambling.

At a pretrial hearing, the court heard five days of testimony from psychiatrists and psychologists who took opposing views of the efficacy of any insanity defense.[5] Testimony was also adduced on the specific question of the propriety of a compulsive gambling basis for insanity.[6] In an opinion reported at 570 F.Supp. 721 (1983), Judge Cabranes rejected the Government's suggestion that the insanity defense be abolished, but he did grant the prosecution's request to exclude a compulsive gambling defense. The trial judge noted that admit-

York is currently considering shifting the burden of proof in insanity cases. *See* New York Times, May 2, 1984, at B2, col. 3. Because insanity is generally regarded as an affirmative defense conceptually distinguishable from the mens rea element of a crime, *see* Part III–C *infra*, it has been suggested that shifting the burden of proof on the insanity issue is consistent with the requirement that the Government must prove all elements of the crime beyond a reasonable doubt. *See* House Report, *supra; cf. Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

Several states utilize a system of bifurcated trials in which evidence of insanity may only be presented after guilt has been established. *See, e.g.,* Wis.Stat.Ann. § 971.175 (1971); *Steele v. State*, 97 Wis.2d 72, 294 N.W.2d 2 (1980).

4. The American Psychiatric Association has called for abolition of the "volitional prong" of the definition of insanity, *see* note 2 *supra*. American Psychiatric Association Statement on the Insanity Defense 12 (1982), *reprinted in* 140 Am.J.Psychiatry 681 (1983). The American Bar Association supports this proposal. *See* American Bar Association Policy on the Insanity Defense (1983).

5. Abraham L. Halpern, M.D., Clinical Professor of Psychiatry at New York Medical College and Chairman of the Department of Psychiatry at United Hospital in Port Chester, New York; Jay Katz, M.D., Garver Professor of Law and Psychoanalysis, Yale Law School; and Howard Zonana, M.D., Associate Professor of Psychiatry, Yale University School of Medicine and Co-Director, Law and Psychiatry Unit, Yale University School of Medicine and Connecticut Mental Health Center, testified on the desirability and efficacy of an insanity defense in the criminal justice system. The Government also submitted a voluminous "Brandeis Brief" reprinting various articles criticizing the insanity defense.

6. The witnesses who testified on the general question of the insanity defense, as well as the specific compulsive gambling issue, were Stephen Rachlin, M.D., Chairman of the Department of Psychiatry and Psychology, Nassau County Medical Center, and Dr. Ames Robey, a forensic psychiatrist and founding member of the American Academy of Psychiatry and the Law (submitted statement), who testified for the Government. Torniero's witnesses were Marc Rubenstein, M.D., a psychiatrist in private practice in Connecticut; Robert Matefy, Ph.D., Professor of Clinical Psychology at the University of Bridgeport; Msgr. Joseph A. Dunne, President of the National Council on Compulsive Gambling; Patricia Nere, M.S.W., Director of the Connecticut Statewide Treatment Program for Compulsive Gambling in Bridgeport; Ernest Prelinger, Ph.D., Chief Clinical Psychologist, Yale University Department of University Health; Robert Custer, M.D., Chief of Treatment Services, Veterans Administration Central Office in Washington; and Julian Taber, Ph.D., Director, Gambling Treatment Program, Brecksville Veterans Administration Medical Center in Cleveland.

ting the gambling defense would expose the jury to extensive, technical, and contradictory expert evidence. *Id.* at 723; we discuss this rationale in Part III D *infra.* Judge Cabranes also ruled that the relationship between a putative compulsion to gamble and an urge to steal was simply "too tenuous to warrant the introduction of expert witnesses," 570 F.Supp. at 733, and he concluded that the proffered evidence was irrelevant to the issue of insanity. *Id.* at 734.

A four-day trial on the interstate transportation charges was conducted in November, 1983. The Government's evidence of the jewel thefts included inculpatory statements and confessions Torniero made to private investigators and the FBI. According to the trial testimony, jewelry valued at approximately $750,000 was purloined by Torniero and transported from New Haven to the Diamond District in Manhattan, where the defendant sold the loot for cash. In his defense, Torniero presented two psychiatrists who testified that the defendant suffered from paranoia, depression, and a narcissistic personality, rendering him insane under the prevailing test established in *Freeman. See* Part II *infra.* Other witnesses testified to Torniero's good character. A psychiatrist took the stand for the Government in rebuttal, contradicting Torniero's experts and stating the defendant was sane at the time the crimes were committed.

The jury deliberated for less than an hour before convicting Torniero on eight counts of interstate transportation of stolen goods, 18 U.S.C. § 2314. Torniero is now serving a three-year prison term, to be followed by five years' probation and an ongoing duty to pay restitution to his victim. The trial judge also recommended that Torniero undergo treatment for his compulsive gambling affliction.

The Government does not attempt to cross-appeal Judge Cabranes's refusal to "abolish" the insanity defense. The sole issue raised on appeal, therefore, is Torniero's contention that the trial judge erred by refusing to permit the compulsive gambling defense to be presented to the jury.

## II

Because our affirmance of the district court's decision to exclude the compulsive gambling defense is based on application of the prevailing definition of insanity in this Circuit, we believe it necessary to review the process by which the standard evolved. Even at a time when the existence of witches and demons was received truth, our system of justice recognized that no purpose is served by criminally punishing certain offenders who cannot be considered responsible for their actions; the first recorded insanity acquittal occurred in 1505. Robitscher and Haynes, *In Defense of the Insanity Defense,* 31 Emory L.J. 9, 11 (1982). The current reappraisal of the law of insanity began with the Hinckley verdict. The modern law of insanity has its genesis in an equally celebrated attempted assasination and acquittal of the perpetrator.

In 1843, Daniel M'Naghten killed British Prime Minister Robert Peel's secretary while attempting to shoot Peel. At a lengthy trial, M'Naghten presented evidence that he suffered from what today would be diagnosed as insane delusions of persecution, and the jury acquitted him on the basis of insanity. Reaction in British society was fierce and immediate, with Queen Victoria bringing the prestige of the monarchy to bear on an attempt to rectify the perceived injustice of the verdict. The judges of the common law courts were summoned into extraordinary session, where they formulated the familiar M'Naghten Rule defining the criminally insane individual as one who "was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong." 8 Eng.Rep. 718, 722, 10 Clark & Fin. 200, 210 (1843). *See generally* Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and its Subsequent Develop-*

*ment in the United States: An Historical Survey,* 54 Cal.L.Rev. 1227 (1966). The M'Naghten, or "right-wrong" test, was the prevailing rule for more than a century after its formation, and remains the sole test for insanity in a minority of the states.

The M'Naghten Rule was supplemented in several jurisdictions by a test permitting acquittal when the defendant was driven by an irresistible impulse to commit the offense. *See* LaFave & Scott, Criminal Law § 37 (1972). Another attempt to modernize the M'Naghten rules was the *Durham* standard, which states that a defendant is not criminally responsible if his unlawful act was the product of a mental disease or defect. *Durham v. United States,* 214 F.2d 862, 874 (D.C.Cir.1954). Although *Durham* swept away the intellectual debris of a century, *United States v. Freeman, supra,* 357 F.2d at 621, it was never widely adopted and application of its test proved troublesome. *See, e.g., Blocker v. United States,* 288 F.2d 853, 860 (D.C.Cir.1961) (Burger, J., concurring). From a legal standpoint, the suggestion that insanity could be the product of sociopathic behavior or a personality disorder, *see, e.g., McDonald v. United States,* 312 F.2d 847, 851 (D.C.Cir.1962), raised the possibility that virtually any anti-social conduct, including substance abuse, recidivism, or so-called impulse disorders such as kleptomania, would be a basis for an insanity defense to an offense unrelated to the specific compulsion. A *Durham*-type test carried to its logical conclusion could therefore lead to the exculpation of a wide range of criminal behavior.

The American Law Institute test we adopted in *Freeman* states that a "person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." Model Penal Code § 4.01(1) (proposed Official Draft 1962). The "wrongfulness of his conduct" test is often referred to as the "cognitive" prong of the standard; the "conform his conduct" alternative test is known as the "volitional" prong. The cognitive prong is a modern refinement of the M'Naghten right-wrong test, while the volitional prong has as its antecedents the irresistible impulse and *Durham* standards.

The ALI test conclusively establishes that "the terms mental 'disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *United States v. Freeman, supra,* 357 F.2d at 625; Model Penal Code § 4.01(2) (proposed Official Draft 1962). In so stating, it attempts to prevent the anomalous situation implied by *Durham,* in which a psychiatrically or psychologically diagnosed condition overtly manifested only by anti-social behavior could be recognized as a mental disease or defect, and the exception of deviancy from social norms swallows the rule of criminal responsibility.

We now turn to the issue presented to us. Is a compulsive gambling defense consistent with the ALI definition of insanity we adopted in *Freeman?*

### III

#### A.

The maxim that an appellate court's purview is narrower than that of a court of first instance can have no better specific illustration than the circumstances of this appeal. The trial court was called upon to consider the conceptual rationale for the defense of insanity; we are required to determine if the appellant was wrongfully prevented from adducing evidence related to compulsive gambling. The district court focussed most of its attention upon the larger issue of insanity. Judge Cabranes did propound two reasons for not permitting the gambling defense: the potential for jury confusion posed by a large amount of conflicting psychiatric testimony (a position with which we do not agree, *see* Part III D *infra*), and the absence of a nexus between the urge to gamble and the offense charged. 570 F.Supp. at 723, 733–34.

Because the district judge did not discuss in depth the gambling issue, however, we deem it useful to set forth the approach a district court should take in deciding whether to permit a compulsion-based insanity defense.

■ At the outset, we note that relevance is a threshold requirement that must be met before the issue of jury confusion or potential prejudice is weighed. *Compare* Fed.R.Evid. 402 *with* Fed.R.Evid. 403. Relevance is a question of law to be decided by the trial judge, who ultimately will make the final determination if proffered evidence tends to prove or disprove a matter "properly provable in the case." Fed. R.Evid. 401 advisory committee note. If the court concludes that evidence is relevant, it may then make an evaluation whether exclusion is nevertheless warranted because the evidence is unduly prejudicial. Fed.R.Evid. 403. The court's discretion in ruling on relevance, and in assessing potential prejudice, is broad. *United States v. Carson*, 702 F.2d 351, 368 (2d Cir.), *cert. denied,* — U.S. —–—, 103 S.Ct. 2456–57, 77 L.Ed.2d 1335 (1983). Because, relevance must be established before potential prejudice can be considered, we will discuss these tests in that order.

### B.

■ At the pre-trial hearing, the trial court considered, *inter alia*, whether evidence of Torniero's compulsive gambling was relevant to the issue of criminal responsibility for the offense of interstate transportation of stolen goods. In conducting this inquiry, the court was to be guided by "principles evolved by experience or science, applied logically to the situation at hand." Fed.R.Evid. 401 advisory committee note. Torniero's proffered evidence consisted of the opinions of experts who would describe the nature of the compulsion to gamble. Expert evidence is not immune from the relevance requirement, however, and must be excluded if irrelevant. *See* 3 Weinstein's Evidence ¶ 702[02] (1982).

To put in issue the defense of criminal insanity under the prevailing ALI test in effect in this Circuit, Torniero must make a showing that compulsive gambling is a mental disease or defect. He must also demonstrate that the infirmity could have prevented him from appreciating that theft was wrongful, or could have deprived him of the ability to restrain himself from the criminal act.[7] Torniero does not urge that his condition could have rendered him incapable of appreciating the illegality of transporting stolen goods. He contends only that under the volitional prong of the ALI test, the compulsion to gamble rendered him unable to resist becoming a thief and stealing to support his habit. *Cf. United States v. Lewellyn*, 723 F.2d 615 (8th Cir.1983), in which a stockbroker argued that he embezzled funds from his employer in order to finance his own speculative investment. The Eighth Circuit assumed the investment activity constituted compulsive gambling and proceeded to rule the defense inadmissible. *See id.* at 617. The proposed defense, therefore, would only be relevant if pathological gambling were a mental disease or defect capable of making Torniero unable to resist the urge to steal.

■ This principle on which Torniero relies is a novel one. The disorder of pathological gambling was not included in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders until publication in 1980 of the third edition (hereinafter referred to as "DSM–III", the appellation used in the profession and by Judge Cabranes).[8] Where, as here,

---

7. If the defendant can make such a showing, the burden of proof shifts to the Government to establish beyond a reasonable doubt that the defendant is sane. *See, e.g., United States v. Currier*, 405 F.2d 1039, 1042 (2d Cir.), *cert. denied,* 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228

(1969). This judge-made rule may soon be changed by statute. *See* note 2 *supra*.

8. DSM–III describes "pathological gambling" as a chronic and progressive failure to resist impulses to gamble and gambling behavior that compromises, disrupts, or damages per-

a defendant contends that evidence of a newly-recognized disorder would be relevant to an insanity defense, there must be a showing that respected authorities in the field share the view that the disorder is a mental disease or defect that could have impaired the defendant's ability to desist from the offense charged or to appreciate the wrongfulness of his conduct. We state no iron-clad mathematical rule, but we do not believe that an hypothesis subscribed to by only a small number of professionals establishes that a proposed defense can carry the day on relevance.

At the same time, we recognize that unanimity on mental health issues is rare and we suggest no requirement of universal or even majority professional acceptance. In fashioning its preliminary decision on relevance, a court must make a discretionary determination that the hypotheses relied upon have substantial acceptance in the discipline, as a basis for a finding that the disorder is relevant to the insanity defense. Cf. United States v. Lewellyn, supra, 723 F.2d at 619.[9]

The first hurdle Torniero's proposed insanity defense must traverse is that the alleged disorder constitute a mental disease or defect as that term is used in the ALI definition. We are convinced that per-

suasive evidence was adduced at the pretrial hearing to justify a conclusion that members of the mental health profession hold seriously contradicting views in this regard. In the instant case, testimony previously given by Dr. Ames Robey before the trial court in Lewellyn, supra, was submitted by the Government at the hearing. Dr. Robey, who helped draft DSM–III, testified that the clinical definition of compulsive gambling as a "failure to resist" rather than an "inability to resist" the urge to wager was a deliberate effort to distinguish this disorder from those defects of the mind appropriate for an insanity defense. Another psychiatrist testified before Judge Cabranes in support of the argument that compulsive gambling is not a mental disease or defect as defined by the ALI rule. Several mental health and social work professionals testified on the debilitating effects of the compulsion to gamble, and stated for the record that they believed the pathology should be considered a mental disease or defect. One of these witnesses, however, conceded that "pathological gambling has not ever been considered a serious disorder" within the profession. See testimony of Dr. Robert Custer, pre-trial hearing transcript at 487.

The trial court stated no conclusion on the issue, nor are we called upon to

---

sonal, family, or vocational pursuits. The gambling preoccupation, urge, and activity increase during periods of stress. Problems that arise as a result of the gambling lead to an intensification of the gambling behavior. Characteristic problems include loss of work due to absences in order to gamble, defaulting on debts and other financial responsibilities, disrupted family relationships, borrowing money from illegal sources, forgery, fraud, embezzlement, and income tax evasion.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ¶ 312.31 (3d Ed.1980).

9. We would distinguish this standard from the analogous federal rule that evidence based on a scientific principle is admissible if it is helpful to the trier of fact. Fed.R.Evid. 702. That standard, which only applies to relevant evidence, does not by its terms require a showing of "general acceptance" in the scientific community as that expression was used to bar evidence of a blood pressure lie detector test in the classic case of Frye v. United States, 293 F. 1013 (D.C.Cir.1923). Some commentators suggest

this omission indicates that general acceptance is not required under Rule 702, and relevant scientific testimony may be admitted if probative value outweighs potential prejudice. See, e.g., 3 Weinstein's Evidence ¶ 702[03] (1982); United States v. Williams, 583 F.2d 1194, 1197–98 (2d Cir.1978) (spectographic voice identification allowed). Other courts continue to employ the Frye standard, at least to exclude some forms of scientific assessment, see, e.g., United States v. McDaniel, 538 F.2d 408, 413 (D.C.Cir. 1976) (spectographic voice identification disallowed), and no consistent rule has emerged in the federal courts. See American Bar Association Section of Litigation, Emerging Problems Under the Federal Rules of Evidence 197–203 (1983). Although we advert to a showing of substantial acceptance in our discussion of the initial determination of relevance, we express no view whether demonstrably relevant evidence must be based on a "generally accepted" scientific theory to be admissible pursuant to Fed.R.Evid. 702.

rule that compulsive gambling can never constitute a mental disease or defect.[10] We need not rest, however, on the ground that the proffered gambling defense was not shown to be a mental disease or defect. Assuming, without deciding, that it did cross that threshold of the ALI test, there is still ample basis for the trial court's conclusion that Torniero's compulsive gambling disorder is not relevant to the insanity defense. The trial judge correctly noted that the relevance standard requires that the pathology alleged have "a direct bearing on [the] commission of the acts with which [the defendant] is charged." 570 F.Supp. at 734. In sum, a compulsion to gamble, even if a mental disease or defect, is not, *ipso facto*, relevant to the issue whether the defendant was unable to restrain himself from non-gambling offenses such as transporting stolen property. *See United States v. Hansen*, 701 F.2d 1078, 1080 (2d Cir.1983) ("The criminal law ... concerns itself precisely with the mental state of the accused in the doing of the proscribed act.").

Although several of Torniero's witnesses expressed the opinion that compulsive gamblers they have treated or observed were unable to resist the impulse to steal as a result of the gambling pathology, this view was vigorously contradicted by the Government's experts. Moreover, not one of the experts stated that the connection between compulsive gambling and the impulse to steal for purposes of the insanity defense

has substantial acceptance in the profession. While we cannot agree with the trial court that no evidence whatsoever on the volitional nexus between gambling and stealing was adduced, *see* 570 F.Supp. at 734, we are of the view that there is ample basis in the record to warrant the conclusion that the trial judge did not abuse his discretion in finding the connection between the two was not satisfactorily established. In the absence of such evidence the proffered defense cannot be deemed relevant to the insanity defense as defined in *Freeman*. Our disagreement, however, with the district court's characterization of some of the evidence or with some of its statements does not prevent us from affirming the result. *See, e.g., Blum v. Bacon*, 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 2359 n. 5, 72 L.Ed.2d 728 (1982).

## C.

Our conclusion that the trial court did not abuse its discretion in determining that the proposed evidence was irrelevant is reinforced by the consistency between our holding and the underlying rationale of the insanity defense. Because it exculpates behavior that would otherwise merit criminal sanction, the insanity defense is an expression of society's judgment that the individual should not be held accountable for his actions. As we noted in Part II, *supra*, the *Freeman* standard was developed in part to prevent the limitless application of an

---

**10.** Prior to formulation of DSM–III, a compulsive gambling defense was apparently offered in few reported cases. In *Steele v. State, supra* note 3, the defense introduced evidence of compulsive gambling and other psychiatric and social problems to show the defendant could not have formed the requisite intent to kill. The jury found the defendant guilty of first degree murder, rejecting the contention that he was insane under the ALI test. A compulsive gambling defense to accusations of non-gambling criminal activity was similarly unsuccessful in *United States v. Bertolene*, No. CR 80–67 (W.D. N.Y.1980), and *United States v. McGee*, No. CR 78–80 (D.Nev.1978); in both cases the ALI test also applied. A defendant who alleged that he was a paranoid schizophrenic and buttressed this argument with an expert's characterization of his compulsive gambling was convicted of

armed robbery in *State v. DiPaglia*, 64 N.J. 288, 315 A.2d 385 (1974) (M'Naghten rule).

The only reported cases involving a compulsive gambling defense since DSM–III was written are: *United States v. Gilliss*, 645 F.2d 1269 (8th Cir.1981) (compulsive gambling defense offered at trial on charges of kidnapping and interstate transportation of motor vehicle; jury verdict of guilty upheld on appeal by court that did not reach the admissibility issue; ALI test applied); *United States v. Lewellyn, supra*, 723 F.2d at 615 (8th Circuit, distinguishing *Gilliss*, ruled compulsive gambling defense inadmissible in embezzlement trial; ALI test applied); and *State v. Lafferty*, 189 Conn. 360, 456 A.2d 272 (1983) (trial court acquitted defendant charged with larceny on grounds of insanity; appellate court did not reach issue whether defense was properly admitted; ALI test applied).

insanity standard that would exculpate sociopathic behavior the sole evidence of which was repeated antisocial or destructive conduct. The American Psychiatric Association aptly emphasizes, "persons with antisocial personality disorders [such as compulsive gambling] should, at least for heuristic reasons, be held accountable for their behavior." American Psychiatric Association Statement on the Insanity Defense 11 (1982), *reprinted in* 140 Am.J. Psychiatry 681 (1983).

In this regard, it is instructive to compare compulsive gambling with the classic impulse disorder, substance abuse. The *Freeman* insanity test explicitly states that substance abuse without more does not constitute insanity. *Id.*, 357 F.2d at 625. This is consistent with the common law notion that while intoxication can in some instances exculpate a defendant, it does not absolve the otherwise guilty of criminal responsibility in the same sense as does a finding of insanity. The alcoholic who lacks specific intent is not guilty of the offense charged. In contrast, the person adjudged insane is deemed by reason of his infirmity to be not criminally responsible, whether or not he possessed the necessary intent to commit the criminal act. *See* La-Fave & Scott, Criminal Law § 45 (1972). If drunkenness, for example, precluded formation of the *mens rea* constituting an element of the offense charged, the inebriated defendant could be found not to have possessed the necessary intent. *See, e.g.,* Model Penal Code § 2.08 (proposed Official Draft 1962). Intoxication does not otherwise absolve the defendant of criminal responsibility, nor is there any requirement, constitutional or otherwise, that it do so. *See Powell v. Texas*, 392 U.S. 514, 533–34, 88 S.Ct. 2145, 2154–55, 20 L.Ed.2d 1254 (1968).

■ Substance abuse may only be used as the basis of an insanity defense if the affliction brings about actual insanity. In effect, then, if the compulsion precipitates a mental disease or defect rendering the defendant incapable of distinguishing right from wrong or of controlling his collateral actions, insanity as that term is defined in the ALI test might be established. *Cf. United States v. Lyons*, 731 F.2d 243 (5th Cir.1984) (en banc) (narcotics addiction without showing of physiological or psychological sequelae does not establish basis for insanity defense). Substance abuse which may be relevant to the *mens rea* issue is not perforce relevant to the issue of insanity. LaFave & Scott, Criminal Law § 45 (1972); *see also Powell v. Texas, supra,* 392 U.S. at 533, 88 S.Ct. at 2154. In sum, there must be a link between the substance abuse and the requirements for insanity separate and distinct from any effect substance abuse may have on *mens rea*.

Similarly, there must be a connection between the compulsion to gamble and the inability to conform with the law or to restrain oneself from breaking the law. It is this link between a putatively mentally diseased compulsion to gamble and an uncontrollable urge to steal that the trial court specifically found unsupported by the evidence adduced at the pre-trial hearing.

We therefore conclude that the trial court correctly acted within its discretion in deciding that evidence of a compulsive gambling disorder would not be relevant for an insanity defense to the charge of interstate transportation of stolen goods.

### D.

While we believe the trial judge acted within his discretion in concluding the proffered evidence was irrelevant, we cannot agree that the defense could have been kept from the jury solely because of the alleged potential for confusion. In the case at bar, one reason given by the trial judge for excluding the compulsive gambling defense was his desire to avoid exposing the jury to "voluminous [and] probably contradictory testimony couched in the technical jargons of the various mental health professions." 570 F.Supp. at 723.

The trial court's concern for jury confusion seems to have been related to the court's more general statements regarding the nature and purpose of the insanity de-

fense, made in response to the Government's capacious request to abolish the defense entirely. The judge, for example, stated that insanity as a legal concept "occurs when the state of the defendant's mind is such that it is alienated from ordinary human experience." 570 F.Supp. at 731. While we do not necessarily quarrel with this description if it is an illustrative rather than a limiting definition, we cannot agree that it compels the conclusion that an assertion of insanity must be kept from the jury unless "the allegation of disease or defect ... amount[s] to an allegation that at the time of the acts with which he has been charged the defendant's mental state was such that the jury could not comprehend it." 570 F.Supp. at 732.

Ordinarily, the trial court in its discretion may exclude relevant evidence that could unduly delay the trial, prejudice a party, or mislead the jury. Fed.R.Evid. 403; see, e.g., United States v. Carson, supra, 702 F.2d at 368. This is not a case, however, where a specific piece of evidence or the testimony of a particular expert would be eliminated. The effect of the preclusion here is to keep an entire line of argument from being presented to the jury. The unique character of the insanity defense militates against exclusion on the sole ground that the jury would be confused by the clashing opinions of experts. The insanity defense by its very nature is complex and perhaps even confusing at times. But, evidence submitted to a jury in many cases is frequently obfuscated. The framers of the Bill of Rights expected that juries would be capable of resolving disputed issues of fact in the federal courts. Even in civil litigation, where non-perspicuous issues and abstruse evidence proliferate, we have never acknowledged a "complexity exception" to the right to a jury trial. See, e.g., City of New York v. Pullman Inc., 662 F.2d 910, 919–20 (2d Cir. 1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

The ALI standard is designed to permit all pertinent evidence, including experts' professional evaluations, to be considered by the trier of fact. It is the function of the jury to evaluate conflicting evidence and reach a decision on criminal responsibility by applying society's values to the legal issues in dispute. United States v. Freeman, supra, 357 F.2d at 620. In making this legal and moral judgment, the jury should not be shielded from differences of opinion in a profession that can never be entirely devoid of subjective disagreements. Psychiatric testimony should not be excluded solely as a result of an unfounded belief that "a jury will not be able to separate the wheat from the chaff." Barefoot v. Estelle, — U.S. —, 103 S.Ct. 3383, 3398 n. 7, 77 L.Ed.2d 1090 (1983).

## IV

As the psychiatric and psychological professions refine their understanding of impulse disorders such as pathological gambling, courts are called upon to make difficult and delicate decisions under the volitional prong of the insanity test.[11] We rule today that when evidence of an impulse disorder is offered in support of an insanity defense, the trial judge must first determine that the evidence is relevant. We do not foreclose admissibility of compulsive gambling in all circumstances, nor do we speculate on the desirability of the changes in the insanity law now being considered by Congress.

The insanity defense has never been free from controversy, criticism, and revision. No rule designed to embody societal values will ever be sacrosanct. As our understanding of the intricacies of the fathomless human mind continues to evolve, legal rules must respond to changed conceptions of the nature of moral culpability, and to advances in the science of mental illness. The fundamental question will always be an inquiry into how best to embody society's sense of what conduct is appropriate

---

**11.** This prong of the ALI test may be abolished by statute. See note 2 supra. The Fifth Circuit, sitting en banc, recently abolished the volitional prong of its definition of insanity, while retaining the cognitive arm of the ALI test. United States v. Lyons, supra.

for punishment by criminal sanctions. The district court's exclusion of the compulsive gambling defense proposed here accords with accepted notions of criminal responsibility as we described them in our definition of insanity. *United States v. Freeman, supra,* 357 F.2d at 622. Accordingly, we affirm the judgment of conviction.